37342, 37375. ALEXANDER v. STATE (two cases).

HILL, Presiding Justice.

The defendant in this case, Willie James Alexander, was convicted by a jury of murder and was sentenced to life imprisonment.

The parties are in substantial agreement as to the facts; they disagree as to the interpretation of those facts. The evidence showed that the victim, Garland Wilson, and his wife, Freeda Wilson, separated in 1979, and during their separation the defendant lived with Freeda Wilson for some three months. Subsequently, in May of 1979, Freeda and her husband resumed living together. On the night of May 16, 1980, sometime between 7 and 8 p.m., the defendant arrived at the third floor apartment of Ann Hadley, which was located directly across the hall from the Wilson's apartment. The defendant had a gun in his coat. Ann Hadley was leaving, but planned to return later to go to a nightclub with her boyfriend. The defendant decided to accompany them and waited at the Hadley apartment for

Ann to return.

According to the defendant, about 8:30 or 9:00 p.m., Freeda Wilson asked him to get her some beer. He and Sam Hadley, Ann's son, went to a store and brought back beer for her. At that time, the defendant and Freeda Wilson "had some words." Sam Hadley corroborated the trip for beer and also testified that the defendant did not drink any beer and that Freeda Wilson was drunk. Johnny McClendon, a downstairs neighbor on the second floor, saw the defendant and Sam Hadley going to the store.

After the defendant brought the beer to Freeda, she called him on the telephone at the Hadley apartment. Ann Hadley then called saying she was on her way home. When she arrived, apparently around 11 p.m., Freeda had called again and the defendant was talking to her on the phone. The defendant told Ann Hadley that Freeda had a gun and had said she would not let anyone leave the Hadley apartment. Ann Hadley took the phone and told Freeda she was coming out. When Ann Hadley, her boyfriend, and the defendant emerged from the Hadley apartment, Freeda was standing at her door with a shotgun. Freeda ordered the three to come into her apartment. Ann Hadley tried to talk Freeda into putting the gun away. She and her boyfriend then left the apartment and proceeded down the stairs. The defendant stayed behind. He was able to get the shotgun from Freeda and leaned the gun against a wall.

According to the defendant's testimony, he then started to leave but Freeda blocked the way, closed the door, and locked it with her deadbolt keys. There was no other door to the apartment through which the defendant could leave. In about five minutes, Freeda's husband, Garland Wilson, arrived with a box from Church's, a fried chicken restaurant. Several witnesses, including the victim's father, testified that Garland Wilson customarily carried a gun; his father testified that Garland carried the gun in regard to his work. Finding that he could not open the door because Freeda's keys were in the deadbolt lock, Garland Wilson announced that he would count to five and then kick the door in (he had done it before). Before Sam Hadley closed his door and threw himself to the floor, he saw Garland Wilson loading his gun as he counted. Johnny McClendon (who was in the apartment below the Wilson's) heard Garland Wilson say "Let me in. When I count to five I'm gonna kick the door in." He testified that Garland Wilson stopped at three and he could hear a woman saying "Baby I've got to talk to you." Then he heard Wilson start counting again. When Wilson got to three, McClendon heard two shots, a pause, and an additional one or two shots.

The defendant testified that Garland Wilson said he would count to five and then kick the door down, that when he got to three

Freeda interrupted saying "let me talk to you", and that Garland then said, "[I]f you don't open the door I'm gonna count to five and I'm gonna start shooting." When Garland got to three, the defendant shot downward through the door twice to scare Garland Wilson. He testified that he had looked through the peephole and that he deliberately shot away from Wilson. Freeda started screaming and let go of the door. According to the defendant, Garland Wilson stepped through the door with his gun out and pointed it at Freeda; he then saw the defendant and started to turn toward him; at that point, the defendant shot in self-defense. He then ran out, threw the gun away, and went to his home.

Wilson had been fatally wounded by the shot, which entered his head behind his right ear, followed a level track and exited over his left eye. There were no powder burns.

After banging on the Hadley's door without success, Freeda Wilson ran downstairs to the McClendon apartment and told Mrs. McClendon that someone had shot in her apartment and she thought some of her children had been shot. After calling the police, Mrs. McClendon went upstairs and found Garland Wilson lying in the darkened apartment with his gun in his hand. Johnny McClendon and Ann Hadley confirmed that the victim had a gun in his hand. It had not been fired. When the police arrived they asked Mrs. McClendon to try to calm Freeda down. Freeda changed her story and told Mrs. McClendon her husband had been shot from outside the apartment. When Freeda was accused by Mrs. McClendon of shooting her husband, Freeda changed her story to implicate the defendant.

The defendant admitted that when the police first questioned him at his home shortly after the incident, he denied having been at the apartment building. In the police car he admitted being at the apartment but said he was leaving when he heard shots. When questioned at the police station, he told the police what had really happened as related in his testimony.

The police officer who questioned the defendant at the station testified that the defendant told him he had been with Freeda that afternoon, that they had been drinking, and that they had an argument; that he had gone to the Hadley's and after seeing her husband leave, he called Freeda, asking if he could come over; that when Wilson returned, Freeda wouldn't let her husband in; that Wilson said he would count to 5 and kick the door in; and that when the door opened and he saw Wilson's gun, he shot through the door twice and fled.

The state's ballistics expert testified that the gunshot holes in the door were approximately 4 feet up from the floor (one was 4' 1

1/2", the other 3' 11 3/4"), had been fired through the door when it was closed, and hit the brick wall on the landing between the first and second floor. He also testified that the fatal bullet had not been fired through the door.

On rebuttal, the state called Felicia Hadley, Ann Hadley's 13-year-old daughter. She testified that on 3 or 4 occasions, the last occurring about 3 months before the shooting, she had heard the defendant say he was going to kill Garland Wilson. She explained that this would occur when Freeda and the defendant would be at the Hadley's apartment and Garland Wilson would arrive home, necessitating Freeda's return. According to Felicia, Freeda and the defendant would both be angry and the defendant would say, "I'm gonna kill that. . . ." On cross examination Felicia Hadley said she had never heard the defendant "threaten" the victim. On redirect she reaffirmed her direct testimony. The defendant retook the stand and denied having threatened to kill Garland Wilson.

1. The defendant urges that the evidence is not sufficient to enable a rational trier of fact to find the defendant guilty of murder beyond a reasonable doubt. He urges that a rational jury should have found him not guilty by reason of self-defense. See Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). We disagree.

Under Jackson, supra, the evidence is to be viewed in the light most favorable to support the jury's finding. Here a rational jury was authorized by the evidence to find that the defendant and the victim's wife had had an affair, that the defendant had said he was going to kill the victim, that the victim came home to find himself locked out of his apartment, that the victim's wife was in the apartment, that shots were fired from inside the apartment, that the victim entered his apartment with his gun in hand, that the victim was shot behind the right ear with the bullet exiting over his left eye, that the defendant fled the scene and disposed of the lethal weapon, and that the defendant at first gave police a false story consistent with the story given by the defendant's paramour (i.e., that the defendant was not involved in the shooting). The jury was not required to find that the defendant acted in self-defense in killing the victim; it was authorized to find the defendant guilty of murder. Jackson v. Virginia, supra.

2. The defendant complains that the trial court erred in refusing his request to charge that "mere presence at the scene of a crime . . . even when coupled with flight, is insufficient to authorize conviction." We find no error. Here there was more than "mere presence." The undisputed evidence showed that the defendant was the actual perpetrator, and that not only did he flee but he disposed of the murder weapon and then attempted to conceal from police his

commission of the crime. The trial court's charge on flight was proper whereas the defendant's request was not adjusted to the evidence and could have misled the jury.

3. The defendant enumerates error upon the trial court's refusing to give his request to charge the fourth headnote in *Simpson v. State,* 12 Ga. App. 292 (4) (77 SE 105) (1912), which reads as follows: "If a jury, upon the trial of a criminal case, are satisfied from the evidence, beyond a reasonable doubt, that the accused is guilty of one of two or more offenses of which the defendant may lawfully be convicted under the indictment against him, but have reasonable doubt as to which of these offenses the defendant is guilty of, it is their duty to give him the benefit of the doubt and find him guilty only of the lower grade of offense. . . ."

In *Simpson,* supra, the court held that it was not error to give such charge. Accord, *Kimball v. State,* 63 Ga. App. 183 (7) (10 SE2d 240) (1940). In *Blount v. State,* 147 Ga. App. 742 (250 SE2d 191) (1978), and *Moore v. State,* 151 Ga. App. 100 (2) (258 SE2d 915) (1979), the court held that it was not error to refuse to give requests based upon *Simpson.*

We agree with *Blount v. State* and *Moore v. State,* supra, for the reason that the *Simpson* charge may confuse a jury. Assume for the purpose of discussion that the two offenses involved are, as they were here, murder and involuntary manslaughter. If a jury has a ". . . reasonable doubt as to which of these offenses the defendant is guilty of. . . ." *Simpson v. State,* supra, then the jury must have a reasonable doubt as to both such offenses, but the *Simpson* charge has as its predicate that the jury be satisfied beyond a reasonable doubt that the defendant is guilty of one or more of the offenses.

We find that the better practice in charging the jury is that followed by the trial court, which was, in summary, that the burden of proof is on the state, the definition of reasonable doubt, the definition of murder, the jury's authority to find the defendant guilty of murder if convinced beyond a reasonable doubt, the jury's authority to consider the lesser offense if the defendant be found not guilty of murder, followed by the definition of the lesser offense.

Defendant relies upon People v. Ray, 43 Mich. App. 45 (204 NW2d 38) (1972), and its progeny. In that case the trial court instructed the jury that they must be unanimous in finding the defendant not guilty of murder before they could discuss and vote on the lesser charge. The Michigan Court of Appeals found such instruction to be coercive and unduly restrictive. Although in the case before us the trial court did instruct the jury that in the event the defendant were found not guilty of murder, the jury would be authorized to consider the lesser offense, the trial judge did not

charge the jury that they must be unanimous in finding the defendant not guilty of murder before they could discuss the lesser offense. We find no error in the charge as given or in the court's refusal to give the requested charge.

4. The trial court instructed the jury as to credibility of witnesses and reconciliation of conflicts. The trial court did not give the defendant's request to charge as to impeachment, and the defendant urges that this was error in light of the contradictory testimony of Felicia Hadley. We find that under the facts of this case the trial court's charge as to credibility and reconciling conflicts in the testimony adequately covered the request to charge and that the court's failure to give the requested instruction was not error.

Moreover, we note that the defendant's requested charge included the statement that where a witness has been successfully impeached, "he ought not to be believed and it is the duty of the jury to disregard his entire testimony. . . ." An instruction similar to that requested was found to be reversible error in United States v. Holland, 526 F2d 284 (5th Cir. 1976). See also the concurring opinion of this writer in *Campbell v. State,* 237 Ga. 76, 77 (226 SE2d 601) (1976). The trial court did not err in refusing to give the request to charge.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 7, 1981.

*Robert M. Coker,* for appellant.
Willie J. Alexander, *pro se.*
*Lewis R. Slaton, District Attorney, H. Allen Moye, Assistant District Attorney, Arthur K. Bolton, Attorney General,* for appellee.